## WISCONSIN ET AL. *v.* FEDERAL POWER COMMISSION ET AL.

No. 72.   Argued January 9, 1963.—Decided May 20, 1963.*

---

*Together with No. 73, *California et al.* v. *Federal Power Commission et al.*, and No. 74, *Long Island Lighting Co. et al.* v. *Federal Power Commission et al.*, also on certiorari to the same Court.

*Kent H. Brown* argued the cause for petitioners in No. 72. With him on the briefs were *John W. Reynolds,* Attorney General of Wisconsin, *Roy G. Tulane,* Assistant Attorney General, *William E. Torkelson, Morton L. Simons* and *Barbara M. Suchow.*

*William M. Bennett* argued the cause for petitioners in No. 73. With him on the briefs was *J. Calvin Simpson.*

*J. David Mann, Jr.* argued the cause for petitioners in No. 74. With him on the briefs were *David K. Kadane, Bertram D. Moll, Vincent P. McDevitt, Samuel Graff Miller, William W. Ross* and *John E. Holtzinger, Jr.*

*Richard A. Solomon* argued the cause for the Federal Power Commission, respondent. With him on the brief were *Solicitor General Cox, Ralph S. Spritzer, Howard E. Wahrenbrock, Leo E. Forquer* and *Arthur H. Fribourg.*

*Kenneth Heady* argued the cause for Phillips Petroleum Company, respondent. With him on the brief were *Charles E. McGee* and *Lambert McAllister.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

Almost nine years have passed since this Court's decision in *Phillips Petroleum Co. v. Wisconsin,* 347 U. S. 672, holding that the Federal Power Commission has jurisdiction over the rates charged by an independent producer of natural gas. The present case, involving

the same independent producer, Phillips Petroleum (Phillips),[1] is a sequel to that earlier decision and strikingly illustrates the unique problems confronting the Commission in its efforts to achieve the goal of effective regulation.

## I.

Following the remand in the *Phillips* case, the Commission, proceeding under § 5 (a) of the Natural Gas Act,[2] reinstituted its general investigation of the lawfulness of Phillips' rates with respect to its sales of natural gas in interstate commerce. Later, it consolidated with that investigation 12 proceedings under § 4 (e) of the Act[3]

---

[1] Phillips is a large integrated oil company which is also a producer of natural gas. It is known as an "independent" in that it does not engage in the interstate gas pipeline business and is not affiliated with any interstate gas pipeline company.

[2] Section 5 (a) of the Natural Gas Act, 52 Stat. 823, 15 U. S. C. § 717d (a), provides:

"Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates."

[3] Section 4 (e) of the Natural Gas Act, 52 Stat. 823, as amended, 76 Stat. 72, 15 U. S. C. (Supp. IV) § 717c (e), provides:

"Whenever any such new schedule is filed the Commission shall have authority . . . to enter upon a hearing concerning the lawful-

which involved the lawfulness of certain specific rate increases filed by Phillips under § 4 (d) between June 1954 and May 1956. All of these rate increases had been suspended by the Commission for the maximum five-month period permitted by the statute (§.4 (e)) and had subsequently gone into effect subject to refund of any portion that might ultimately be found excessive (*ibid.*). With one minor exception, each of these increases had been superseded by a subsequent increase,[4] all of which were

ness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible."

[4] The exception involves an annual increase of $21,234, and we are advised by Phillips that this increase has since been superseded by a later filing, not suspended by the Commission.

in turn suspended and are the subject of separate § 4 (e) proceedings not now before us.[5]

Hearings in these consolidated proceedings did not begin until June 1956 and extended over a period of almost 18 months. All parties proceeded on the assumption that the lawfulness of Phillips' rates was to be determined on the basis of its jurisdictional cost of service for the test year 1954,[6] and four full-scale cost-of-service studies were presented. A Commission Examiner in April 1959 issued a comprehensive decision (24 F. P. C. 590) comprising over 200 pages, in which he found that Phillips' jurisdictional cost of service for the test year was $57,280,218. He then ordered Phillips to calculate a rate which, when applied to 1954 volumes, would produce revenues substantially equal to its test year cost of service. This rate, with appropriate adjustments for quality, pressure, etc., was to be applied to all of the company's rate schedules on file with the Commission at the time of Commission approval.

Over one year later, in September 1960, the Commission issued the opinion that is the subject of the present litigation. 24 F. P. C. 537. Its basic conclusion was that the individual company cost-of-service method, based on theories of original cost and prudent investment, was not

---

[5] An increased rate which is later superseded by a further increase is thus effective only for the limited intervening period, called the "locked-in" period, and retains significance in § 4 (e) proceedings only in respect of its refundability if found unlawful. See, infra, pp. 304–305.

[6] The phrase "jurisdictional cost of service" as used here means the producer's system-wide cost of service (i. e., all operating expenses, including depreciation, depletion, and taxes, plus a fair return on the rate base) for its sales of natural gas subject to the Commission's jurisdiction. The "test year 1954" means the calendar year 1954, with adjustments for certain changes in costs and increases in revenues through 1956. No challenge is here made by either side to any aspect of the Commission's determination of Phillips' jurisdictional cost of service for the test year.

a workable or desirable method for determining the rates of independent producers and that the "ultimate solution" lay in what has come to be known as the area rate approach: "the determination of fair prices for gas, based on reasonable financial requirements of the industry" for each of the various producing areas of the country. 24 F. P. C., at 547. This means that rates would be established on an area basis, rather than on an individual company basis. As initial steps toward this end, the Commission did two things at the same time it issued the opinion in these proceedings. *First,* it promulgated a Statement of General Policy (S. G. P. 61–1), since amended on several occasions, in which it set forth area-by-area "price levels" for initial and increased rate filings by producers, and stated that in the absence of compelling evidence it would not certificate initial rates, and would suspend increased rates, which exceeded these price levels.[7] *Second,* the Commission announced that it would begin a series of hearings, each designed to cover a major producing area. (At least one of these hearings, involving the Permian Basin, is now well under way.)

The Commission, in its opinion here, gave several reasons for rejecting as unsuitable the individual company cost-of-service method. 24 F. P. C., at 542–548. In particular it emphasized that, unlike the business of a typical public utility, the business of producing natural gas involved no fixed, determinable relationship between investment and service to the public. A huge investment might yield only a trickle of gas, while a small investment might lead to a bonanza. Thus the concept of an individual company's "prudent investment," as a basis for calculat-

---

[7] The Statement of General Policy, as originally issued, appears at 25 Fed. Reg. 9578. It was issued without notice or hearing, and the Commission expressly stated that the price levels were "for the purpose of guidance and initial action by the Commission and their use will not deprive any party of substantive rights or fix the ultimate justness and reasonableness of any rate level."

ing rates that would call forth the necessary capital and also. protect consumers from excessive charges, seemed wholly out of place. Further, the Commission noted that the individual company cost-of-service method gave rise to staggering cost allocation problems, could result in such anomalies as widely varying prices for gas coming from a single field and even from a single jointly owned well, and would create an intolerable administrative burden in requiring a separate rate determination for each of the several thousand independent producers.

Returning to the proceedings before it, the Commisssion decided that, despite its disapproval of the cost-of-service method, the whole case having been tried on that basis, a final administrative determination of cost of service for the test year should be made. It then proceeded to resolve a number of difficult questions, including those relating to allocation of production and exploration costs, allocation of costs between natural gas and extracted liquids, and rate of return, and arrived at a system-wide jurisdictional cost of service for the test year of $55,548,054—a figure which substantially exceeded jurisdictional revenues ($45,568,291) for that year.[8]

With this determination in hand, the Commission turned to the consolidated § 4 (e) proceedings, involving specific rate increases filed through May 1956, and found that those increases had produced increased revenues of only about $5,250,000 annually, or considerably less than the total deficit for the test year. It also stated that there was nothing in the record to show that any of the increased. rates were "unduly discriminatory or preferential." It then concluded that since it could not order refunds of any portion of these increases, in view of the continuing

[8] On rehearing, the cost of service was redetermined to be $54,525,315, or 11.1009¢ per Mcf, subject to certain necessary adjustments for purchased gas costs, gathering taxes, and royalties. These adjustments would increase the average unit cost to about 12.16¢ per Mcf.

deficit, and since all increases had been superseded, there would be no purpose in continuing the § 4 (e) proceedings and, with two exceptions, they were terminated.

The two exceptions concerned rate increases under "spiral escalation" clauses in Phillips' contracts,[9] and these two proceedings were kept open because the proper amount of the particular increases depended on the amount of increases, if any, allowed to certain pipeline customers of Phillips in their own rate proceedings then pending before the Commission. The Commission refused to hold such spiral clauses void *ab initio*, and in fact a rate increase in one of the 10 *terminated* § 4 (e) proceedings had resulted from the operation of a spiral escalation clause.

The Commission recognized that there remained almost 100 other § 4 (e) proceedings, involving increases filed by Phillips, that had not been consolidated in this case. It said that since the present record indicated that Phillips' costs exceeded revenues at least through 1958 it was inviting Phillips to file motions to terminate all § 4 (e) proceedings relating to increases filed prior to 1959, thus limiting future consideration of Phillips' rates to 1959 and after. Whether this invitation has been accepted by Phillips is not disclosed, but in any event none of these other § 4 (e) proceedings is before us now.

Turning to the § 5 (a) investigation of the lawfulness of Phillips' existing rates, the Commission first noted that there was considerable disagreement over how these rates should be set—whether they should be approximately uniform throughout the country or should vary from area to area. It then said that it was aware that both costs and prices had greatly increased since 1954

---

[9] These clauses provided that when a specified commodity price index increased by more than a certain number of points and a general increase in a Phillips pipeline customer's resale rates had gone into effect, then Phillips' rates to that customer could be proportionally increased.

(and especially after 1958) and it therefore did not "deem it appropriate to prescribe or require that Phillips file rates for the future based upon the present record." 24 F. P. C., at 575–576. Concluding that the public would be adequately protected by Phillips' potential refund obligations under § 4 (e), by the area pricing standards announced in the Statement of General Policy, and by the area rate proceedings to be initiated, the Commission ordered the termination of the present § 5 (a) investigation.

On application for rehearing, the Commission rejected the suggestion that it should reopen the case for submission of 1959 cost data. 24 F. P. C. 1008. It said that the "interest of consumers and the exigencies of regulation will be better served in rate proceedings brought on an area basis rather than on an individual company basis," and that the area method would lead to "more effective and expeditious regulation of the producer sales." 24 F. P. C., at 1009. It also rejected the claim that it had erred in terminating the § 4 (e) proceedings because *some* of the increased rates were in excess of the average unit cost of service, reiterating that there had been no showing of undue discrimination or preference and that the *total* revenue resulting from the increases did not make up the deficit shown by the test year determination.

On review, the Court of Appeals, in a thorough and informative opinion, affirmed the decision of the Commission. 112 U. S. App. D. C. 369, 303 F. 2d 380. Judge Fahy, dissenting in part, argued that whether or not the area rate method of rate regulation was the ultimate solution, the Commission having gone so far in this proceeding should have finished it by deciding on a cost-of-service basis the justness and reasonableness of Phillips' past increases and of its present rates. To have failed to do so, he believed, was a clear abuse of discretion. We granted certiorari because of the importance of this case

in the administration and future operation of the Natural Gas Act. 369 U. S. 870.

The arguments of the parties, both in their briefs and at the bench, have covered a broad range of subjects, including a number of other administrative actions and proceedings—past, present, and future—that are not before us today. We lay these collateral subjects to one side and focus on the three precise questions that have been brought here for review: whether the Commission erred (1) in refusing to reject certain increased rates because they were based on spiral escalation clauses; (2) in terminating the 10 consolidated § 4 (e) proceedings involving increases now superseded and in leaving two such proceedings open only for a limited purpose; or (3) in discontinuing the § 5 (a) investigation of the lawfulness of Phillips' current rates. Of these three questions, which will be considered in the order stated, the third is the only one vigorously pressed by all petitioners and is clearly the principal issue in the case.

## II.

California, alone among the petitioners, challenges the Commission's refusal to declare void *ab initio* the spiral escalation clauses in Phillips' contracts on which rate increases in three of the 12 § 4 (e) dockets were based.[10] Such clauses, California contends, are manifestly inconsistent with the public interest, because they constitute a price mechanism by which "[c]onsumers of natural gas are caught in a maelstrom."

But we have at least grave doubts that this question may be raised by California at this time. As to two of the three dockets, the claim would appear premature, since the dockets are still pending, and the increases there involved may eventually be disallowed if the pipeline increases on which they depend are themselves dis-

---

[10] See note 9, *supra*.

allowed by the Commission. As to the third docket, the particular increase has been made fully effective by termination of the § 4 (e) proceeding, but since the sale in question is to the Michigan-Wisconsin pipeline and appears to affect no California interests, no one whom California may properly represent is "aggrieved" (§ 19 (b)) [11] by the Commission's order.

Further, we see no merit in California's contention. It is true that the Commission has announced *prospectively* that it would not accept for filing contracts containing such clauses,[12] but it would have been quite a different matter for the Commission to have declared that *past* rate increases were ineffective simply because they were based on spiral provisions. The effect of a contract clause of this type, of course, is only to permit the producer to resort to the filing provisions of § 4 (d) of the Act. If the increase is challenged, the producer must still establish its lawfulness wholly apart from the terms of the contract. Thus we have sustained the right of a seller to file an increase under a contract which, in effect, authorized him to do so at any time. *United Gas Pipe Line Co.* v. *Memphis Light, Gas and Water Division,* 358 U. S. 103. The spiral clauses here are far more limited in scope, depending as they do on the occurrence of external events.

### III.

The claim that the Commission erred in terminating 10 § 4 (e) dockets, and leaving two others open only for a limited purpose, is pressed primarily by Wisconsin and New York. In considering their contentions, it should

---

[11] 52 Stat. 831, as amended, 15 U. S. C. § 717r (b).

[12] By Order Nos. 232, 26 Fed. Reg. 1983, and 232A, 26 Fed. Reg. 2850, the Commission announced that spiral escalation clauses contained in contracts executed on or after April 3, 1961, would be inoperative and without effect. By Order No. 242, 27 Fed. Reg. 1356, the Commission announced that contracts containing such clauses would be unacceptable for filing on or after April 2, 1962.

be noted again that all of the rate increases involved were filed prior to the end of 1956, and have since been superseded or "locked in" by subsequent increases [13] which, with one exception, have been suspended and made the subject of separate § 4 (e) proceedings.

The Commission's termination of these § 4 (e) dockets was a decision on the merits. It was based on the finding that the annual increase in revenue produced by these increased rates was substantially less than the deficit for the test year 1954. Petitioners' principal objection appears to be that Phillips' overall, and unit (per Mcf.), revenues increased so substantially that they may have exceeded costs during the 1955–1959 period for which the increases were allowed. But the fact is that Phillips' average unit revenues during this period never rose significantly above its test year unit revenue requirements as determined by the Commission.[14] Moreover, petitioners do not claim, nor could they on this record, that the test year cost of service was *higher* per unit than in subsequent years. And assuming that unit costs did not decline, it is clear that the increases here did not even bring unit revenues up to those unit costs. Whether other subsequent increases involved in separate proceedings not before us resulted in revenues exceeding cost of service in later years has no effect on the propriety of terminating *these* § 4 (e) dockets. Thus the factors that may have made the record stale for purposes of determining in the § 5 (a) investigation whether Phillips' *present* rates are unjust or unreasonable do not make the record stale for purposes of determining the lawfulness of these *past* increases.

---

[13] See note 5, *supra*.

[14] Phillips' test year unit revenue requirements, on the basis of the Commission's determinations, were about 12.16¢ per Mcf. See note 8, *supra*. Data from Phillips' annual reports, filed with the Commission, show average jurisdictional revenues as follows: 8.9¢ (1955); 9.4¢ (1956); 9.9¢ (1957); 11.1¢ (1958); 12.3¢ (1959).

Petitioners also claim that the Commission terminated the § 4 (e) proceedings improperly because it failed to make any finding that the increased rates in question were just and reasonable. But this contention goes to the form and not the substance of what the Commission did. Since these increased rates were "locked in," their validity for the future was not at issue; the sole question was whether all or any part of the increases had to be refunded by Phillips. Having decided on the basis of substantial evidence that the increases did not bring revenues up to cost of service, the Commission properly concluded, on the only matter before it with respect to these dockets, that no refund obligation could be imposed.

It was urged on rehearing before the Commission, and in the court below, that some of the increased rates were above average cost of service and that at most the Commission should have terminated only those § 4 (e) dockets in which the increased rates did not exceed the average unit cost of service. The Commission rejected this contention, stating that Phillips' rates would normally vary greatly because sales were made at widely separated points and under different conditions, and that there was little or nothing to be gained by entering a protracted investigation of allocation of costs to particular past rates "when it is already known that Phillips was not earning its whole cost of service." 24 F. P. C., at 1009.

We believe this conclusion was justified,[15] and petitioners appear to have all but abandoned the theory that

---

[15] We find no necessary inconsistency between this determination and the Commission's recent decision in *Hunt Oil Co.*, 28 F. P. C. 623, in which the Commission remanded § 4 (e) proceedings for the taking of additional evidence and stated:

"Our examination of the record in this case convinces us that increased rates for specific sales cannot always be found to be just and rea-

some of the § 4 (e) dockets were improperly terminated merely because the particular increased rates in those dockets exceeded average cost. Rather, they now urge that the variation in the increased rates was so great as to compel the conclusion that they were "discriminatory and preferential *per se.*" The Commission noted that there was nothing in the record to show unlawful discrimination, and it is clear that mere differences in rates under this Act are not *per se* unlawful. But in any event, we need not reach the merits of the claim of discrimination because it is not properly before us. It was not presented to the court below, nor was it adequately raised on application to the Commission for rehearing, a step required by § 19 (b) of the Act in order to preserve a point for judicial review. See, *e. g., Sunray Mid-Continent Oil Co.* v. *Federal Power Comm'n,* 364 U. S. 137, 157.

## IV.

The final question is whether the Commission was justified in terminating the § 5 (a) investigation of the reasonableness of Phillips' current rates. Preliminarily, it is important to observe that the Commission's accomplishments since the original *Phillips* case, the validity of the Statement of General Policy 61–1, the actions taken pur-

---

sonable solely on the basis of a comparison of individual company-wide costs with that company's revenues in a test year." 28 F. P. C., at 626.

The record in the *Hunt* case is not before us, but it is evident from the Commission's opinion that, unlike the present case, certain increased rates there involved were not "locked in" and were higher than the currently prevailing rates in the production area. Thus the factors that may have merited limited supplementation of the record in that case with respect to the § 4 (e) proceedings were not present here. It should also be noted that in *Hunt,* as here, the Commission decided not to pursue the broad § 5 (a) inquiry into the lawfulness of all of the producer's present rates. See p. 314, *infra.*

suant to it, and the lawfulness of the area pricing method are not themselves before the Court for review. To a limited extent, however, these matters do bear upon the propriety of the Commission's decision to terminate this § 5 (a) proceeding.

As the petitioners recognize, the issue is whether the termination constituted an abuse of discretion, a discretion which in general is broad but which the petitioners urge is a good deal narrower in a proceeding that has gone this far than in the case of a decision whether or not to *initiate* an inquiry. See *Minneapolis Gas Co.* v. *Federal Power Comm'n,* 111 U. S. App. D. C. 16, 294 F. 2d 212. Underlying petitioners' position are their claims that the result of the termination is little or no effective regulation in the interim period before the development of area rate regulation, that such regulation may take many years to evolve, and that the method may eventually be held invalid.

1. The petitioners are not of one mind as to the feasibility and lawfulness of the area rate method of regulation, although no one questions the Commission's right to undertake the experiment. California appears to come closest to the view that the individual company cost-of-service method is the only lawful basis for rate regulation and that the invalidity of the area approach is therefore predictable. If we believed that such a departure from present concepts had little, if any, chance of being sustained, we would be hard pressed to say that the Commission had not abused its discretion in terminating this § 5 (a) proceeding while undertaking the area experiment. For if area regulation were almost sure to fail, and if the individual company cost-of-service method of determining the reasonableness of rates had been abandoned, then there would be virtually no foreseeable prospect of effective regulation. Difficult as the problems of cost-of-service regulation may be, they would not warrant a breakdown of the administrative process.

But to declare that a particular method of rate regulation is so sanctified as to make it highly unlikely that any other method could be sustained would be wholly out of keeping with this Court's consistent and clearly articulated approach to the question of the Commission's power to regulate rates. It has repeatedly been stated that no single method need be followed by the Commission in considering the justness and reasonableness of rates, *Federal Power Comm'n* v. *Natural Gas Pipeline Co.*, 315 U. S. 575; *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U. S. 591; *Colorado Interstate Gas Co.* v. *Federal Power Comm'n*, 324 U. S. 581, and we reaffirm that principle today. As the Court said in *Hope:*

> "We held in *Federal Power Commission* v. *Natural Gas Pipeline Co., supra,* that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its ratemaking function, moreover, involves the making of 'pragmatic adjustments.' *Id.,* p. 586. And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. *Id.,* p. 586. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling." 320 U. S., at 602.

More specifically, the Court has never held that the individual company cost-of-service method is a *sine qua non* of natural gas rate regulation. Indeed the prudent investment, original cost, rate base method which we are now told is lawful, established, and effective is the very one the Court was asked to declare impermissible in the *Hope* case, less than 20 years ago.

To whatever extent the matter of costs may be a requisite element in rate regulation, we have no indication that the area method will fall short of statutory or constitutional standards. The Commission has stated in its

opinion in this proceeding that the goal is to have rates based on the "reasonable financial requirements of the industry" in each production area, 24 F. P. C., at 547, and we were advised at oral argument that composite cost-of-service data will be considered in the area rate proceedings. Surely, we cannot say that the rates to be developed in these proceedings will in all likelihood be so high as to deprive consumers, or so low as to deprive producers, of their right to a just and reasonable rate.[16]

We recognize the unusual difficulties inherent in regulating the price of a commodity such as natural gas.[17] We respect the Commission's considered judgment, backed by sound and persuasive reasoning, that the individual company cost-of-service method is not a feasible or suitable one for regulating the rates of independent producers. We share the Commission's hopes that the area approach may prove to be the ultimate solution.

---

[16] We do not interpret the decision of the Court of Appeals in *Detroit* v. *Federal Power Comm'n*, 97 U. S. App. D. C. 260, 230 F. 2d 810, to suggest that, in the view of that court, individual company cost of service is the method required to be used in independent natural gas producer rate regulation. The court did express the view that, in considering the price which a pipeline could charge for gas produced from its own wells, cost of service must be used "at least as a point of departure." 97 U. S. App. D. C., at 268, 230 F. 2d, at 818. Whatever the court may have meant in that context, it is clear that it did not have before it any questions relating to the area rate method, and it is interesting to note that Judge Fahy, the author of the *Detroit* opinion, said in his opinion below in this case: "We should not seek to deter the Commission from pursuing such a method [the area method] in future proceedings, or from using it in any proceedings already initiated along those lines." 112 U. S. App. D. C., at 379, 303 F. 2d, at 390. See also *Panhandle Eastern Pipe Line Co.* v. *Federal Power Comm'n*, 113 U. S. App. D. C. 94, 305 F. 2d 763.

[17] See the discussion in the opinions of Mr. Justice Jackson in *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U. S. 591, 628–660, and in *Colorado Interstate Gas Co.* v. *Federal Power Comm'n*, 324 U. S. 581, 608–615.

2. This is not a case in which the Commission has walked right up to the line and then refused to cross it— a case, in other words, in which all the evidence necessary to a determination had been received but the determination was not made.   Here, the Commission concluded that the record, relating to the test year 1954, was too stale in 1960 to permit a finding as to the justness and reasonableness of Phillips' current rates.   In view of this inadequacy, and since the Commission must establish the unlawfulness of present rates before taking further action in a § 5 (a) proceeding, continuation of the proceeding would have required remanding the case for the receipt of evidence as to costs in at least one subsequent test year. None of the petitioners specifically challenges the Commission's conclusion that, for § 5 (a) purposes, the record was stale in 1960; *a fortiori* it is stale today.[18]

Thus the question whether the Commission abused its discretion in terminating the proceeding must be measured against the only alternative: remanding for additional evidence.   Such a remand undoubtedly would have consumed considerable time and energy, including that of the Commission and its staff, and would almost certainly have involved another decision by a hearing examiner, another appeal to the Commission, another petition for rehearing and further judicial review of complex and difficult issues.   In short, the alternative rejected by the Commission would not have resulted in definitive regu-

---

[18] The fact that this record may have been stale by the time the Commission rendered its decision certainly does not mean that no rate proceeding can be decided before the record becomes out of date. This pilot proceeding was one of unusual length and complexity, and the Commission noted that both costs and revenues "increased greatly" between the test year and the year of decision.   The Commission has presumably learned a great deal in this case which will be of use to it in the area proceedings, and there is no reason to suppose that those proceedings will be rendered incapable of decision by the march of time.

lation of Phillips' rates immediately or in the near future. Indeed, several years might have elapsed before even the method of regulation which the Commission regards as unsuitable would have become effective as to even this one producer.

3. It is contended that, as a result of the decision to terminate this § 5 (a) proceeding, the public will receive significantly less protection against the charging of excessive prices by Phillips (and others) in the interim period before the area method sees the light of day. Were this the case, it would bear importantly on our review of the Commission's exercise of its discretion. But in this connection several factors should be noted. *First,* the record before us does not paint a picture of the public interest sacrificed on the altar of private profit. Indications are that at least until 1959 Phillips' jurisdictional revenues did not catch up to its cost of service. Although revenues increased substantially after that time, the Commission observed that costs have also risen dramatically, and we have no basis for assuming that current rates are grossly unreasonable.

*Second,* most of Phillips' increased rates now in effect are the subject of pending § 4 (e) proceedings and are thus being collected subject to refund. Refund obligations, it is true, do not provide as much protection as the elimination of unreasonable rates, see *Federal Power Comm'n v. Tennessee Gas Transmission Co.,* 371 U. S. 145, 154–155, but they are undoubtedly significant and cannot be ignored, as some of the petitioners would have us do.

*Third,* it is clear that since the Commission's decision in this proceeding, the upward trend in producer prices has been substantially arrested, and in at least one important area the trend has actually been downward.[19] Al-

---

[19] The area is South Louisiana, and the downward trend is due in part to settlement of certain rate cases and the ordering of substantial refunds.

though the Statement of General Policy did not purport to establish just and reasonable rates, see note 7, *supra,* the price levels declared in that statement, along with implementation of the program there announced, appear to have played a significant role in accomplishing this result.

*Fourth,* it must be remembered that the problem of this transitional period would still exist if the present §.5 (a) proceeding were reopened for the taking of new evidence; there is no way of predicting how much time would be required for a final decision to be rendered, but it would inevitably be substantial. It is therefore evident that the choice is not between protection or no protection. There will in either event be some protection, though doubtless with room for improvement, for several years.

Petitioners claim that forcing the Commission to re-open this § 5 (a) investigation will not unduly delay area rate proceedings and will in fact provide useful information for area rate-making purposes. The Commission, with equal vigor, states that it does not have the facilities to reopen this case (and all others that have reached approximately the same stage) and at the same time to proceed expeditiously with its area investigations. It estimates that the Permian Basin area proceedings, a case involving some 35% of Phillips' jurisdictional sales and roughly 10% of sales by all producers, will be completed in about the same time that would be required to complete a remanded § 5 (a) proceeding relating to Phillips alone. It warns that if it is required to reopen this and similar proceedings, the result may be to delay unduly the area investigations, while compelling adherence to a method the Commission deems unworkable, thus providing significantly less protection for the public both in the long and the short run.

The Court cannot resolve this dispute against the Commission and tell it that it has made an error of law—abused its discretion—in deciding how best to allocate its

resources. The case might be different if the area approach had little or no chance of being sustained; if the present record were now ripe for determination of reasonable rates for Phillips on an individual company cost-of-service basis; or if it were manifest that the public would receive significantly less protection in the interim period than if the proceeding had not been terminated. But as we have already concluded, none of these conditions exists, and in their absence a reversal of the Commission would be a sheer act of interference in the details of the administrative process. Indeed, it might well have the effect of postponing even further the time when effective regulation will be realized.

Finally, the fact that the Commission in this case terminated the § 5 (a) proceedings, rather than merely holding them in abeyance as it did in *Hunt Oil Co.,* 28 F. P. C. 623,[20] is a circumstance of no significance. At the oral argument general counsel for the Commission assured us that the Commission remains free to reactivate the investigation of Phillips' individual rates if the area proceedings are unduly delayed or if circumstances should otherwise warrant. The distinction between termination and suspension of the § 5 (a) proceedings is thus one of form and not of substance. In either event the Commission retains the flexibility it must have at this still formative period in a difficult area of rate regulation.

*Affirmed.*

---

[20] In *Hunt,* the Commission said: "It is our hope that area proceedings will result in a timely determination of Hunt's rates for the future. However, in order to assure adequate protection to consumers against any unreasonably high rates of Hunt which may not be subject to an early determination on an area basis we will hold in abeyance further action on the 5 (a) aspects of the case pending area rate determinations, with the understanding that 5 (a) proceedings on some or all of Hunt's rates may be subject to reactivation if future circumstances should so dictate." 28 F. P. C., at 626.

Mr. Justice Clark, with whom The Chief Justice, Mr. Justice Black and Mr. Justice Brennan join, dissenting.

The Sisyphean labors of the Commission continue as it marches up the hill of producer regulation only to tumble down again with little undertaken and less done. After 16 years without regulation under the Act, resulting from the Commission's position that it had no jurisdiction over the production of gas, this Court decided *Phillips Petroleum Corp.* v. *Wisconsin,* 347 U. S. 672 (1954).[1] The Court there charged the Commission with supervision over Phillips' operating expenses, both producing and gathering, and directed the Commission to fix a just and reasonable rate for the sale of Phillips' gas. Five years later the Presiding Examiner determined Phillips' 1954 cost of service to be 11.662¢ per Mcf. and allowed it a 9.25% rate of return. He directed and Phillips filed a preliminary rate per Mcf. for 1954 and an adjusted rate for subsequent years. A year and a half later the Commission handed down its decision. It found Phillips' 1954 cost of service to be 11.1009¢ per Mcf.[2] and determined that a fair return would be 11%. It found Phillips' jurisdictional revenues substantially less in 1954 than these allowables and, contra to the recommendation of the Examiner and its own staff, it terminated all save two of the § 4 (e) proceedings, discharged Phillips from further refund obligation thereunder and dismissed its own § 5 investigation of these and subsequent rates covering some 95 substantial rate increases

---

[1] For a discussion of the problems lurking under the decision see the separate dissents of Mr. Justice Douglas and of the writer, 347 U. S., at 687 and 690, respectively.

[2] The 11.1009¢ figure for unit cost of service was announced in the Commission's order amending its opinion and denying rehearing. The figure was subject to redetermination for purchased gas costs, gathering taxes and royalties.

made by Phillips. In addition, it assumed from these 1954 figures that the rates were "probably" not excessive through 1958 and invited motions to dismiss these proceedings, thus approving existing and increased rates for the 1955–1959 period on the sole basis of 1954 costs and revenues. It also concluded that there was "nothing in the record to show that these past rates . . . are unduly discriminatory or preferential," 24 F. P. C., at 576, despite the fact that they varied from 5.5¢ per Mcf. to 13.5¢, with one at 17¢ per Mcf. But this is not all. Concurrently with this action the Commission issued *sua sponte* a Statement of General Policy No. 61–1, 24 F. P. C. 818, 25 Fed. Reg. 9578, in which it discarded its long-established cost method in favor of an area basis of fixing rates. It promulgated two lists of area prices, one covering initial rates under § 7 certificates and another for increasing rates for gas sold under existing contracts subject to § 4 (e). In arriving at these price levels the Commission said that it considered "all of the relevant facts available to us," including cost information, "existing and historical price structures, volumes of production, trends in production, price trends in the various areas over a number of years, trends in exploration and development, trends in demands, and the available markets for the gas." 24 F. P. C., at 819. For the new gas level § 7 certification price, there can be no doubt that the level established as a guide is the *highest* permanently certificated rate in the respective areas as of September 1960. The other gas level announced (for § 4 (e) contracts) was but the average weighted price for gas sold from the respective areas in 1959. It is therefore accurate to say that both levels were based on existing price structures as of September 1960, *i. e.,* averaged field prices. The Examiner, contrary to the Commission, had found the cost method not only more accurate but entirely feasible and, in comparison with the area method, no more delaying. The parties them-

selves, including Phillips, concurred in the conclusion that Phillips' rates should be determined by the Examiner on the basis of its over-all cost of service. Nevertheless the Commission held to the contrary and, in addition, issued the statement of policy and accompanying price levels without notice, hearing or record and has since amended them several times in like manner. In this summary fashion the Commission junked its cost-of-service regulation program, wasted a half-dozen years of work thereon and is now experimenting with a new, untried, untested, inchoate program which, in addition, is of doubtful legality.[3] As a consequence the consumers of gas all over the United States and particularly in the large metropolitan cities of the Eastern Seaboard, the Midwest and the West Coast will pay for the Commission's area pricing wild-goose chase. I predict that in the end the consumer will find himself to be the biggest goose of the hunt and the small producer the dead duck.

I cannot let this pass without saying that, as a result of the Court's approval of the Commission's action here, the gas consumers of this country will suffer irretrievable loss amounting to billions of dollars. I shall now offer a few examples in the Commission's rate-base calculation of 1954 that support this conclusion.

## I. GROSS ERRORS IN THE COST OF SERVICE COMPUTATIONS.

As the Court has pointed out, the Commission terminated not only the § 5 (a) proceeding but also 10 consolidated § 4 (e) proceedings against Phillips, the latter

---

[3] The Presiding Examiner found "[a]ny failure . . . to allow . . . rates sufficient to recoup . . . proper cost of service as here determined, would be inherently unfair and contrary to the public interest. It might also raise a serious question with respect to possible violation of the constitutional prohibition against confiscation." 24 F. P. C., at 780.

on the ground that the revenue received by it for the periods involved was less than cost of service. In view of this disposition it is necessary, aside from the contention that there was no basis for dismissal of those proceedings covering years subsequent to 1954 on that year's findings, for us to examine the basis of its cost-of-service findings for 1954. The dismissal orders are all predicated upon the 1954 cost of service and if it be erroneous the whole basis for the orders of dismissal falls. Thus, while the petitioners have not here argued the specific challenges raised before the Commission and the Court of Appeals, their contention that the Commission abused its discretion in terminating the § 4 (e) proceedings necessarily includes the question of the validity of the determination of cost of service. In addition, the likelihood that the Court's affirmance will be regarded as an approval of these highly questionable standards for cost-of-service determination, thus fostering their application in other cases, calls for discussion of them.

Aside from its direct expenditure for purchased gas[4] the largest single item in Phillips' costs appears to be its exploration and development expense, which was allowed in the amount of some $58,313,230 before allocation. We first examine it and other items going into cost of service.

(a) *Exploration and development, depletion allowance, allocation and interest costs.*—Exploration and development expense for 1954 on the books of the company was $47,474,039, including undeveloped lease rentals, drilling tools, expired and surrendered leases, dry holes and land

---

[4] Phillips sold 688,811,312 Mcf. of natural gas in 1954; it purchased 407,984,210 Mcf. and produced 375,690,912 Mcf. Its jurisdictional sales ran 71.9% of this total. (The difference between the total volume sold and the somewhat higher total volume produced and purchased results from company uses, losses, residue returned to leases, etc.)

and geological activities. On these expenditures a "return and taxes" item was allowed of $10,839,194. Why the consumer should pay on these items, particularly "dry holes" ($11,306,964), expired and surrendered leases ($9,479,898) and undeveloped offshore leases ($17,765,332) is a matter for the experts; but it appears to me that since Phillips charged off the dry holes in its taxes and the consumers got nothing whatever in 1954 from expired and surrendered leases and undeveloped offshore leases, such expense should not be included in the rate base. This expense alone amounted to 4.281¢ per Mcf. of the total allowed cost of service of 11.1009¢. Moreover, in this connection, Phillips also enjoyed a tax depletion allowance of 27½% on all gas production. This allowance for the year 1954 was $44,784,723, giving Phillips a tax saving of over $20,000,000. This latter sum was included in the rate base. However, depletion is allowed as an incentive to exploration and certainly its savings should be deducted from Phillips' total expense in this regard. Since the book deficit between total revenue and cost of service for 1954 was $8,900,000, it appears that a correction of this item alone would turn that deficit into a nice profit.

(b) *Allocation of cost between oil and gas.*—Much of the gas produced for interstate sale is "associated gas," *i. e.*, it is produced along with oil and is known as casinghead gas. Fifty-seven percent of Phillips' gas production is associated gas but it accounted for only 13.42% of its combined revenue. In addition some wells produce condensate liquids and condensate gas which must be separated through gasoline plants. The question is how much of the expense of exploration, operation, etc., of wells should be chargeable to gas. Phillips used a B.t.u. method which allocated 61.88% of the expense to gas. The Commission cut this to 32.742%, equivalent to 4.281¢

per Mcf. The Examiner had recommended 30.46% while the Wisconsin experts came up with 20.812% and Pacific with 23.98%. As is noted above only 13.42% of Phillips' combined revenue comes from associated gas while 86.58% comes from oil. Still the Commission has allocated almost one-third of the exploration cost to gas, which only brings in one-seventh of the combined revenue. This is a most important item since each 1% shift means over a half million dollars in the rate base.

(c) *Purchased gas.*—If allowed increased rates Phillips says its cost of gas will rise automatically under its percentage type purchase contracts. This item of $1,671,733 was disallowed by the Examiner since the suppliers were not shown to have been entitled to any increase. As the Commission points out an increase in rate would not increase the percentage Phillips was obligated to pay. It would require Phillips to pay the pro-rata increase in rates due on percentage gas, but it recoups this plus a profit when that gas is sold. I submit, as the Examiner found, that the allowance of this million and a half in the cost basis is erroneous. Increases through automatic escalator clauses—which effect the same result—are not permitted because not based on any increase in cost of production. In approving this practice in percentage contracts the Commission creates a perfect loophole for these producers and invites more contracts of this nature.

(d) *Interest.*—Expense for money borrowed for 1954 amounted to $9,892,308. On its tax return Phillips claimed an allowance of only $3,743,077. This variance in cost of money seems to have occurred by reason of an exchange of Phillips' outstanding bonds for common stock. The Commission allowed the larger figure on the basis that it was a "known change" that probably would not occur in other years. It is interesting to note that the "known change" theory was not applied to the "San Juan

transfer" made in 1955.[5] If applied there it would have made a difference against Phillips of some $8,000,000 in its 1954 rate base. Certainly common fairness would require the application of the "known change" theory to all cases, not simply an isolated one.

It is readily apparent that the Commission's cost-of-service calculations for 1954 are full of holes. In addition, assuming, as I do not, that the 1954 cost is correct the Commission should not be permitted to extend that cost and the 1954 revenue into subsequent years through 1958 and hold that they too are deficit years. This is, on its face, not in keeping with rate-making procedures. Moreover, the record itself shows the error of the Commission's method. The Examiner found that, on Phillips' own presentation of its costs, the over-all deficiency for 1956 "was not significantly higher than that derived in Phillips' 1954 test year cost of service." 24 F. P. C., at 773. Phillips' revenues, however, increased each year subsequent to 1954. In 1957 they were some $8,000,000 above 1954; they increased some $17,000,000 in 1958 and about $28,000,000 in 1959. In 1960 revenue was $90,856,248, which was practically twice that of 1954 ($45.6 million). These facts, all known to the Commission, required a reappraisal of the cost of service for all years subsequent to 1954, rather than the arbitrary use of the 1954 figures. The necessary data could have been quickly obtained from Phillips which, of course, had its total revenues readily available and, I am sure, had its cost basis for each § 4 increase likewise calculated.[6]

---

[5] The properties of Phillips known as the San Juan transfer were made in 1955 and involved a total "known change" of some $8,000,000 which was not allowed. The assigned reason was that other properties were added but I find no support in the record for this conclusion.

[6] In this connection, it appears strange that the Commission has exempted producers from the Uniform System of Accounts required

## II. The Dismissals and Their Consequences.

The real problem, however, is not so much in Phillips' 1954 level, for that has long since gone by the board and the consumer may as well forget it. The increased levels that became effective between 1954 and the date of the decision in April 1959 are the main rub. The Examiner understood this when, in his final order, he directed Phillips to file uniform rates which would, when applied to sales made in 1954, bring Phillips its 1954 costs and allowed return. He further directed that the same schedule of rates be applied to all sales made subsequent to 1954 and through the date of his decision and to all sales thereafter. Under this requirement if the subsequent cost of service did increase and was not offset by increased revenues the company could recoup itself with § 4 rate increases. This the Commission refused to do and thereby left Phillips free to collect rates as high as 23.5¢ per Mcf. and subject to no refund. The Commission excused itself on the ground that there would be no reason to fix Phillips' rates on a cost basis since it was going to adopt the area plan. It also found the staleness of the test year prevented its application to subsequent years but obviously this was not the reason. In the first place, it used the "stale" test year of 1954 to justify its finding of deficit through 1958. In addition all parties had agreed upon that year. Investigation covered 1955 and 1956. Hearings began in June 1956 and ran through 1957. Phillips itself presented 1956 data, the latest full year at the time of the closing of the hearings. They were used to show

---

of natural gas companies, 18 CFR, c. 1, part 201. No system has as yet been prescribed for producers. Moreover, the annual reports required from pipelines enable the Commission to promptly determine pipeline expense, returns, earnings, etc. This report for producers merely shows sales under each rate schedule. Finally, pipelines, when filing § 4 rate increases, must attach detailed cost justification. No such requirement is made of producers.

that the cost experience of 1954 was identical for all practical purposes with 1956 and the Examiner so found. It required 15 months for the Examiner to decide the case and prepare a more comprehensive and detailed report which reflected his clear grasp of the problems. See 24 F. P. C. 590–818. Thus, like many major administrative proceedings, this one took five to six years to complete. But, I ask, if this makes the test year stale what of all the other major rate cases? Those that reach us not infrequently have been in the Commission for an equal or longer period. Even if stale, the Commission should not have dumped the whole investigation, hearing, Examiner Report, and staff work down the drain. Before doing so, and in the same opinion, it had already laid down detailed standards in the case for determining cost of service. Indeed it had not only determined the cost to Phillips but had formulated the standards governing its rate of return and calculated its allowable return thereunder. All of this it then discarded. Admitting that additional statistics for subsequent years might have been necessary, such data would have been concerned solely with the application of these already determined standards to those years.

The dismissal of the § 4 (e) and § 5 (a) cases is the more unfortunate and indicates a disturbing disregard of the consumer interest. On the § 4 (e) cases the Court says "most of Phillips' increased rates now in effect are the subject of pending § 4 (e) proceedings . . . ." At this very moment Phillips is making sales at nonrefundable rates as high as 23.5¢ per Mcf. which produce annual revenues more than $3,000,000 in excess of the Commission's SGP 61–1 price levels.[7] On this score in 1956 the Com-

---

[7] The situation is even more extreme in South Louisiana where 55% of the gas is now flowing at prices which exceed the Commissioner's "initial price" ceiling; over 94% is flowing at prices exceeding the Commission's "increased price"; and over 70% is flowing at prices

mission authorized a large number of § 7 high price sales without providing for any conditions. This action was reversed in *Atlantic Refining Co. v. Public Service Comm'n of New York,* 360 U. S. 378 (1959), and like cases. Although § 5 proceedings have been filed on these cases there are substantial numbers of other such sales·that have never been tested and are not now contested. Section 5 proceedings operate prospectively and so, of course, all of the sales are nonrefundable. The statistics indicate that of the 1960 revenue received by 13 major producers about $250,000,000 (roughly 83%) is not subject to refund.[8] Furthermore, the Court says that the rates covered by the § 4 (e) proceedings dismissed herein "were 'locked in,' their validity for the future was not at issue; the sole question was whether all or any part of the increases had to be refunded by Phillips." The fact is that the Commission has used this same "stale" 1954 price year which it discarded, including its income level, in determining that refunds were not due for the subsequent four years and in dismissing those proceedings. Hence dismissal forecloses any recovery of excess rates for the periods covering those proceedings, *i. e.,* the four-year period 1954–1958, which the Commission has found non-

which exceed the level the Commission found "in line" for CATCO gas after our remand in *Atlantic Refining Co.* v. *Public Service Comm'n of New York,* 360 U. S. 378 (1959).

[8] The Court seems to admit that the protection the Congress envisaged in § 4 (e) is in practice illusory. First it comes too late; next, many of the consumers entitled to refunds cannot be found, etc. See *Federal Power Comm'n* v. *Tennessee Gas Transmission Co.,* 371 U. S. 145, 154–155 (1962). An even more realistic consideration is that these refunds have been permitted to reach the astronomical figure of $158,000,000 a year, of which amount Phillips has been receiving some $74,000,000. If the "evil day" for the producer ever arrives where he must pay up, from where will the money come? It would bankrupt the average producer. The Commission would necessarily, in order to protect the service of interstate customers, be obliged to compromise or forgive them.

refundable. As I have shown, the 1954 rate as determined by the Commission has serious questions as to its legality. Certainly the subsequent years—based entirely on it—should not have been dismissed. While it may be true, as the Court says, that "Refund obligations . . . do not provide as much protection as the elimination of unreasonable rates" it must be remembered that here the § 5 (a) case was also dismissed. Why this precipitous action? The proceedings had been on the books for six years! Why did not the Commission leave them pending until final determination of Phillips' responsibility on all of its more than 95 filings? The Commission makes no answer. There is none.

The dismissal of the § 5 (a) proceeding was likewise unjustified. Continuation of the proceeding would have required a remand but the conclusion of the Court that "several years might have elapsed" before a determination of the issue is a bad guess. It has been two years since this dismissal and there is nothing in sight as yet for a final decision on the Permian Basin area proceeding. The Commission has 22 more areas to go. Meanwhile all areas, including Phillips', have escaped regulation for the years 1954–1963, a total of nine years. If in 1960 the Commission had remanded the § 5 (a) proceeding it could long since have been decided, since the enormous increase in Phillips' revenue for 1960 ($45.3 million in 1954 to $90.8 million in 1960) would have definitely shown an excessive rate. The Examiner had found, contrary to the conclusion of the Court, that the 1956 cost of service was not "significantly higher" than 1954. All that would have been necessary was to project this to the three-year period 1957–1959, inclusive. Phillips, I wager, could have done this almost overnight, if it did not already have the figures available. The Commission in determining the standards to be used had allowed every cost item save the allocation on associated gas which could have been easily cor-

rected on the percentages involved. The remainder of Phillips' system of accounting had received the approval of the Commission and would have readily revealed its costs.

The Court says that a new §5 (a) proceeding can be filed. This is true, but if it were filed tomorrow, more than nine years will already have been lost to the consumer!

The Commission, in my view, had no valid excuse for dismissing the §4 (e) and §5 (a) proceedings. It followed exactly the opposite course in *Hunt Oil Co.*, 28 F. P. C. 623. The Court dismisses this case as inapposite but its technical distinction merits no discussion. As I see it the conclusion in *Hunt* not to dismiss the pending proceedings is in direct conflict with the action taken here.

I have considered this record page by page—line by line—and have given the Commission's action my most careful attention. There is but one conclusion—namely, that the Commission erred in its determination of the 1954 cost of service and return; and in dismissing the §4 (e) and §5 (a) proceedings, rather than concluding the case by determining a just and reasonable rate, it acted in an arbitrary and unreasonable manner entirely outside of the traditional concepts of administrative due process.

### III. The Fallacy of the Statement of General Policy.

As the Court says, the validity of the Statement, SGP 61–1, and the rates accompanying it is not before the Court. But despite this declaration I notice that the Court proceeds to discuss the Statement and strongly implies a view as to its validity. I think it both premature and dangerous to pass any judgment at this stage of the proceedings. There are serious legal questions lurking

in the application of the policy and we should not intimate its approval until a definitive case is presented under it. I deem it appropriate to raise these questions here not to join issue on the merits but only to outline the reasons for my reservations about the Court's consideration of this aspect of the case. While I do have serious doubts about both the wisdom and the legality of this approach to price determination, this is certainly not the case in which to give them full-dress treatment.

It is of course true that the cost-of-service method is not the "*sine qua non* of natural gas rate regulation." It is not so much that the Commission must follow a single method but rather that, in abandoning a historic, presently used and undoubtedly legal one in the summary manner done here, it left the production of gas without the required regulation which the Congress has directed. It can hardly be denied that the Commission's action will leave producers for a number of years—estimated by the Court of Appeals at up to 14—without effective regulation and will result in irreparable injury to the consumer of gas. The only brakes on spiraling producer prices are the "guide prices" which the Commission attached to its SGP 61–1. These, rather than being legally established rates, are nonreviewable guides reflecting the highest certificated rate or weighted price. They have no binding effect. Indeed, they may well establish a floor rather than a ceiling.

In addition, area pricing must run the hurdle of legal attack and, to be constitutionally sound, must include a showing that the individual producer at the area rate fixed will recover his costs; otherwise it would be confiscatory and illegal. I cannot share the Court's optimistic view that the Commission's area rate, tested by "the 'reasonable financial requirements of the industry' in each production area," is likely to do this. The facts of gas industry life make it crystal clear that one producer's costs vary

immeasurably from another's and cannot be leveled off—at least until discovered.   For example, Phillips' dry holes cost about $11,000,000, its surrendered leases $9,000,000 and its undeveloped offshore ones $17,000,000.   Are these items to be included in the "reasonable financial requirements" used to fix the rate of the area?   If they are it will be unfair for the reason that other producers in the area may or may not have had such costs.   Inevitably, the area average will be lower than the high cost producer.   Hence the "financial requirements of the industry" will not satisfy him.   If the rate is set by the "financial requirements" of the higher cost producer it will be higher than that necessary to make it just and reasonable to the lower cost producer; thus resulting in a windfall to the latter.   If the "financial requirements" of the lower cost producer are used it will result in a rate that will confiscate the gas of the higher cost producer.   If the higher and lower costs are averaged, as the Commission indicates it intends to do, then the higher cost producer will still not recover his costs and the rate will be confiscatory.   On the other hand the lower cost producer will receive a windfall.   And so, as I see it, the area plan is in a squeeze—i. e., any criteria the Commission uses would not reflect individual just and reasonable rates.   Moreover, it must be remembered that the burden of proving just and reasonable rates is on the producer and he cannot be precluded from offering relevant proof of his cost.   This he will demand in the event his statistics show his costs above those fixed for his area.   And so the cold truth is that, after all of its area pricing investigation and the fixing of a rate pursuant thereto, the producer aggrieved at that rate may demand and be entitled to a full hearing on his cost.   The result is additional delay, delay and delay until the inevitable day when there is no more gas to regulate.

Typical of this simple fact of gas industry life is the announcement last November 15 that the Commission

staff had recommended two prices for the gas of the Permian Basin (Phillips) area. It was below the "guidelines" of the Commission's SGP 61–1 and, further, suggested that these prices be ceilings but not floors. Immediately there sprang up vigorous protest. Independent producers threatened to withdraw their support of the area pricing plan. A meeting was held in Washington with the Commission where it was insisted that "realistic and uniform prices" be followed in each area consistent with the "implied promise" of the original SGP 61–1 in this case. The producers were assured three months later that the "staff's position is not necessarily that of the Commission." See Tipro Reporter, Feb.-Mar. 1963. It does not require a crystal ball to see what will happen regardless of the conclusion of the Commission. If it decides to make the rates suggested a floor, the respective independent producers will require individual cost proceedings; if the rates are made both a floor and a ceiling, thousands of old rates will be raised to the floor and the consumer will pay the bill.

That the Commission's problems are difficult goes without saying. But as complicated as they appear to be it seems entirely feasible for it to solve them. Other agencies have been faced with like congestion problems. Indeed both the National Labor Relations Board and the Wage and Hour Administration found that they could not process all situations confronting them. They adopted procedures that exempted the inconsequential ones. See 23 N. L. R. B. Ann. Rep. 7–8 (1958). The suggestion that the Commission do likewise has much merit. It appears that in 1953, the year before *Phillips,* of all the producers then selling in interstate commerce, each of 4,191 producers sold less than 2,000,000,000 cubic feet of gas annually, the total of their sales being only 9.26% of the gas then sold in interstate commerce. See Landis, Report on Regulatory Agencies to the President-Elect

(1960), 55. In the Commission's opinion in this case it stated that there were 3,372 producers selling interstate in 1960. The number has therefore decreased almost a thousand since the *Phillips* decision in 1954, which indicates that some of the smaller producers have escaped from their interstate commitments. However, if all of those who escaped were in the less than 2,000,000,000 cubic feet bracket there would still remain some 3,000 producers whose sales are miniscule. It therefore appears to me that inconsequential producers by the hundreds might well be temporarily exempted. The Commission could then concentrate on the large producers (20 of them control over 50% of the interstate gas) without the pressures incident to the smaller ones. The integrated producer of large volume is inevitably going to be the low cost producer. Hence his rate will be an effective floor from which the small producer rates might well be adjusted. This would give the consumer rate protection over the overwhelming amount of interstate gas more quickly [9] and would give assurances to the small producer that he would be protected from confiscation.

## IV. INCONSEQUENTIAL MATTERS.

There are two inconsequential matters that the Court discusses. The first is the escalation clause in several of Phillips' contracts. The Commission has promulgated a series of rule-making orders condemning spiral escalation clauses as being against the public interest. By Orders

---

[9] Four cases involving major producers have been decided by the Examiners and five investigations of other major producers have now been completed. These nine producers, with Phillips, handle 30% of all interstate gas. Still no major rate case has been decided since *Phillips*. Only two area cases are under investigation. These two areas—Permian and South Louisiana—furnish only 32% of all interstate gas. The South Louisiana case will take several years to complete.

Nos. 232 and 232A, 25 F. P. C. 379 and 609, respectively, 26 Fed. Reg. 1983 and 2850, it announced that these clauses in contracts executed on or after April 3, 1961, would be without effect. And Order No. 242, 27 F. P. C. 339, 27 Fed. Reg. 1356, announced that contracts containing such clauses would be unacceptable for filing after April 2, 1962. The Commission argues that the contracts under attack here were all dated prior to 1954 and hence its order refusing to find them void should be upheld. This is, of course, a *non sequitur*. Nor is it understandable how the clauses become effective against the public interest and unacceptable in 1961 but the identical provisions are blessed with validity prior to that date. I cannot subscribe to such a doctrine. However, since the Court requires the producer to "establish its lawfulness wholly apart from the [escalation] terms of the contract" I cannot become excited over it. Obviously the clauses have no effect whatsoever in determining the reasonableness of a rate from the public standpoint. They do have the effect of triggering the filing of increased rates. They should be completely outlawed by the Commission when the two § 4 (e) proceedings left pending are decided.

The other miniscule point when compared to the basic questions in the case is whether Phillips' widely varying rates were "on their face unduly discriminatory and preferential," as contended by petitioners in No. 72. The Court refrains from passing on this issue, regarding it as not raised in the court below or on rehearing before the Commission. Section 19 (b) of the Act precludes a court on review from considering an objection not raised in the petition for rehearing before the Commission, but it appears that petitioner Wisconsin adequately raised the issue of discrimination in its rehearing petition,[10] and

---

[10] Wisconsin's petition for rehearing, in point (1), challenged the Commission's policy statements regarding rate regulation, on the ground that "the issue in this case is to determine whether the juris-

the Commission in denying rehearing stated that Phillips' rates "normally vary greatly . . . and there is nothing to show that these rates are discriminatory or preferential." 24 F. P. C., at 1009. I regret that the Court has chosen this occasion to stand on technicality, compare *Federal Trade Comm'n* v. *Broch & Co.*, 368 U. S. 360, 363 (1962), when public interest stands the loss. The patently discriminatory nature of the rate increases, resulting in rates varying from 5.5¢ to 17.5¢ per Mcf. cannot seriously be questioned. The Examiner found that on the date of the *Phillips* decision its prices ranged from 1.2¢ to a high of 15.7¢ per Mcf. He concluded that to continue such a rate structure would preserve "for Phillips an unduly discriminatory general rate structure, which would be contrary to the public interest . . . ." 24 F. P. C., at 790. The Commission staff also found that "Phillips contract rates vary so widely, even as between contracts for the same service from the same producing areas, as to patently contravene the public interest, generating and perpetuating undue preference and undue discrimination." *Id.*, at 790–791. While the issue of discrimination was raised only generally in the Court of Appeals,[11] it was implicit in the broad questions on which we granted certiorari. While the issue is minor as compared to the primary issues here, it certainly results in a miscarriage of justice for the Court, on such a highly technical ground, to permit the Commission's disposition to stand, to the irreparable injury of the consumers of gas.

---

dictional rates and charges or classifications demanded, observed, charged or collected by Phillips, or any rules, regulations, practices or contracts affecting them, *are unjust, unreasonable, unduly discriminatory or preferential.* Natural Gas Act §§ 4, 5." (Emphasis added.)

[11] See points 1 and 2, Brief of Long Island Lighting Co., petitioner in No. 74, on petition for review of the Commission's order in the Court of Appeals.

## V.

As I reminded in the beginning, the Congress directed that gas moving in interstate commerce be sold at just and reasonable rates. The basis of such a determination must have some reference to the costs of the service. The Commission has, however, failed to require this. Instead it has declared the 1954 test year, which it thoroughly investigated, to be "stale" but nevertheless used its findings for that year to release Phillips from regulation not only for 1954 but also for the four succeeding years. Pursuant thereto it dismissed the § 4 (e) proceedings and a § 5 (a) proceeding covering those periods. In addition the Commission has abandoned its cost-of-service program of rate fixing and has embarked on an area basis regulation which is highly questionable. It has also promulgated, without any hearing, rates as guidelines that have no support in evidence as to their justness and reasonableness. Through this course of conduct the Commission's program of producer regulation—of which Phillips is the keystone—has permitted the continued collection of untested, unreasonable, unjust, discriminatory and preferential rates. This situation under the present timetable will continue for years. For these reasons I believe that the public interest requires that this case be reversed and remanded to the Commission with directions to fix the just and reasonable rates of Phillips involved herein. I therefore dissent.